[Nos. G023337, G023921. Fourth Dist., Div. Three. June 8, 1999.]

MICHAEL ARAMBULA, Plaintiff and Appellant, v.
PHYLLIS HAUSER WELLS, Defendant and Respondent.

DIANE ARAMBULA, Plaintiff and Appellant, v.
PHYLLIS HAUSER WELLS, Defendant and Respondent.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts IV, V and VI.

**COUNSEL**

Law Offices of Walter Greene, Jr., and Walter Greene, Jr., for Plaintiffs and Appellants.

Gilbert, Kelly, Crowley & Jennett, Albert P. Di Rocco, Jr., Jennifer M. Damon and Warren S. Fujimoto for Defendant and Respondent.

**OPINION**

**CROSBY, J.**—Charity begins at home. And there it should stay, assuming the donor so intended. To promote the charitable impulse, we apply the collateral source rule to gratuitous payments (including moneys to cover lost wages) by family or friends to assist tort victims through difficult times.

I

In June 1996, Michael Arambula was injured in a rear-end automobile accident caused by Phyllis Hauser Wells. Arambula was employed as a field supervisor in a family-owned company in which his brother owned 70 percent of the stock, his parents owned 15 percent, and he owned 15 percent. Despite missing work because of his injuries, he continued to receive his $2,800 weekly salary. He testified his brother "wished" to be reimbursed, but he had not promised to do so.

Arambula sued Wells for negligence. His claim for damages included loss of earnings during the period of his disability. His wife, Diane Arambula, sued for loss of consortium.

Wells admitted fault, and the case went to trial on causation and damages alone. Arambula contended he sustained a severe brain injury as a result of the accident. Wells denied this.

At the start of trial, Wells moved *in limine* to exclude all evidence and testimony regarding Arambula's lost wages claim of approximately $50,000.

Her attorney, relying on dicta in a footnote in *Helfend* v. *Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 6, fn. 5 [84 Cal.Rptr. 173, 465 P.2d 61, 77 A.L.R.3d 398], argued, "Plaintiff is not receiving payment by means of disability insurance, pension or from utilizing . . . sick time or vacation time. Further, plaintiff has failed to provide any documentation or demand that the monies received from his employer will be required to be reimbursed."

The judge agreed. Based on *Helfend,* he instructed the jury not to award damages for lost earnings "because his employer paid for the time he was off without any requirement to do so and there was no agreement by plaintiff to refund same."

The jury awarded $54,334 to Arambula, but nothing to his wife. Both appeal.

## II

■    Under the collateral source rule, plaintiffs in personal injury actions can still recover full damages even though they already have received compensation for their injuries from such "collateral sources" as medical insurance. (*Pacific Gas & Electric Co.* v. *Superior Court* (1994) 28 Cal.App.4th 174, 176 [33 Cal.Rptr.2d 522].) The idea is that tortfeasors should not recover a windfall from the thrift and foresight of persons who have actually or constructively secured insurance, pension or disability benefits to provide for themselves and their families. A contrary rule, it is feared, would misallocate liability for tort-caused losses and discourage people from obtaining benefits from independent collateral sources. (*Helfend* v. *Southern Cal. Rapid Transit Dist., supra,* 2 Cal.3d at pp. 13-14.)

*Helfend* is the leading case. The court rejected defense efforts to introduce evidence that about 80 percent of an injured motorist's medical bills had been paid by his Blue Cross insurance carrier. Applying a benefit of the bargain rationale, the Supreme Court allowed the motorist to receive the advantage of his investment of "years of insurance premiums to assure his medical care." It stated "[t]he tortfeasor should not garner the benefits of his victim's providence." (2 Cal.3d at pp. 9-10.)[1]

*Helfend* on its face says nothing about gratuitous wage payments. Wells, however, cited *Helfend* to convince the trial court to limit the collateral

---

[1]The collateral source rule also recognizes the inadequacies of damage awards for personal injuries. That is because "[l]egal 'compensation' for personal injuries does not actually compensate. Not many people would sell an arm for the average or even the maximum amount that juries award for loss of an arm. Moreover the injured person seldom gets the compensation he 'recovers,' for a substantial attorney's fee usually comes out of it. The Rule helps to remedy these problems inherent in compensating the tort victim." (Note, *California's*

source rule to situations where plaintiffs incurred an expense, obligation or liability in obtaining the services for which they seek compensation. According to Wells, *Helfend* is "replete with indications that the California Supreme Court does not intend for the collateral source rule to apply to gratuitous payments and services."

Wells specifically relied on footnote 5 in *Helfend* where the court expounded (at some length) about the collateral source rule as interpreted in New York: "The New York Court of Appeals has, for example, *quite reasonably* held that an injured physician may not recover from a tortfeasor for the value of medical and nursing care rendered gratuitously as a matter of professional courtesy. [Citation.] The doctor owed at least a moral obligation to render gratuitous services in return, if ever required; but he had neither paid premiums for the services under some form of insurance coverage nor manifested any indication that he would endeavor to repay those who had given him assistance. Thus this situation differs from that in which friends and relatives render assistance to the injured plaintiff with the expectation of repayment out of any tort recovery; in that case, the rule has been applied." (2 Cal.3d at p. 6, fn. 5, italics added.) ▮▮▮ Wells contends footnote 5 created a new rule of law in California, creating an exception for gratuitous benefits where the injured party has incurred no expense, obligation or liability.

We disagree. It is arguable whether footnote 5 even rises to the level of dicta. *Helfend* itself did not see it that way. To the contrary, the court cautioned, "We expressly do not consider or determine the appropriateness of the rule's application in the myriad of possible situations which we have not discussed or which are not presented by the facts of this case." (2 Cal.3d at p. 6, fn. 3.)

We take *Helfend* at its word. Not only do we consider its language at face value, but we construe it in the light of its facts and the issues raised. (*Fireman's Fund Ins. Co.* v. *Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1301 [77 Cal.Rptr.2d 296].) ▮▮▮ While we do not take lightly any of the Supreme Court's statements, we reasonably construe them in the context of the thoroughness of the court's analysis and in light of its prior

*Collateral Source Rule and Plaintiff's Receipt of Uninsured Motorist Benefits* (1986) 37 Hastings L.J. 667, 672.) Since collateral sources only cover economic damages like medical costs and lost earnings, there is no possibility of a double recovery for intangibles like pain and suffering "which can be translated into monetary loss only with great difficulty." (*Capelouto* v. *Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 893 [103 Cal.Rptr. 856, 500 P.2d 880].) Rather than overcompensating a plaintiff, the collateral source rule "partially provides a somewhat closer approximation to full compensation for his injuries." (*Helfend* v. *Southern Cal. Rapid Transit Dist., supra,* 2 Cal.3d at p. 13.)

expressions on the same subject. (*Hubbard* v. *Superior Court* (1997) 66 Cal.App.4th 1163, 1169 [78 Cal.Rptr.2d 819]; see also 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 947, p. 989.) There are five specific reasons why footnote 5 fails to pass these tests.

First, there is the matter of existing California law (prior to *Helfend*), which made no special distinction for purely gratuitous collateral benefits. In *Tremeroli* v. *Austin Trailer Equip. Co.* (1951) 102 Cal.App.2d 464, 482 [227 P.2d 923], the court stated, "The same rule [as to collateral sources] seems to apply to wages paid an injured person by the employer. The injured employee may still recover the full amount of such wages from the wrongdoer." The Supreme Court repeated similar language in *Fifield Manor* v. *Finston* (1960) 54 Cal.2d 632, 637 [7 Cal.Rptr. 377, 354 P.2d 1073, 78 A.L.R.2d 813]: "The fact that *either under contract or gratuitously* such treatment has been paid for by another does not defeat the cause of action of the injured party to recover the reasonable value of such treatment from the tortfeasor." (Italics added.) If the Supreme Court desired to throw into doubt such long-established pronouncements (including its own decision in *Fifield Manor*), we believe it would have done so more directly than through footnote 5's oblique references to New York decisional law.

Second, no subsequent appellate opinion has construed footnote 5 in the highly expansive manner suggested by Wells. To the contrary, several post-*Helfend* decisions have allowed plaintiffs to recover the costs of gratuitous medical care as an element of their damages even without any contractual right to reimbursement. (*Hanif* v. *Housing Authority* (1988) 200 Cal.App.3d 635, 644 [246 Cal.Rptr. 192] [parents who cared for minor child can recover special damages for reasonable costs of such care based on prevailing rates for home care nurses, even though services were rendered "without an agreement or expectation of payment"]; *Rodriguez* v. *McDonnell Douglas Corp.* (1978) 87 Cal.App.3d 626, 662 [151 Cal.Rptr. 399] [same with respect to wife who provided 24-hour-a-day attendant care to her injured husband: "Insofar as gratuities are concerned, the rule appears to be in keeping with the collateral source rule rationale."]; see also *Pacific Gas & Electric Co.* v. *Superior Court, supra,* 28 Cal.App.4th at p. 180 ["[I]n California even [gratuitous] benefits are subject to the collateral source rule."].) Wells's proposal would create a conflict in the law with the case authority *Hanif, Rodriguez* and *Pacific Gas & Electric Co.*

Third, a majority of jurisdictions and many commentators are in accord. (See 4 Harper et al., Law of Torts (2d ed. 1986) § 25.22, p. 661 ["Most of the cases do not subtract a gift from tort damages."]; Johns, Cal. Damages (5th ed. 1996) § 1.66, p. 1-80 ["The right of the injured person to recover

damages for loss of earnings or impairment of earning capacity is not affected by the fact the employer may have continued to pay the injured person while he or she was disabled. . . . This is the weight of authority in other states."].)[2]

In *Montgomery Ward & Co., Inc.* v. *Anderson* (1998) 334 Ark. 561 [976 S.W.2d 382], a hospital partially forgave a patient's medical bills. The court held the patient was entitled to recover compensation for the full amount of the harm inflicted upon her, notwithstanding the discount, stating "There is no evidence of record showing that [defendant] had anything to do with procuring the discount of [plaintiff's] bill by [the hospital]. The rationale of the rule favors her, just as it would had she been compensated by insurance for which she had arranged." (976 S.W.2d at p. 384.)

Fourth, public policy concerns weigh heavily in favor of application of the collateral source rule to gratuitous payments and services. Just as the Supreme Court in *Helfend* found the rule "expresses a policy judgment in favor of encouraging citizens to purchase and maintain insurance for personal injuries and for other eventualities" (*Helfend* v. *Southern Cal. Rapid Transit Dist.*, *supra*, 2 Cal.3d at p. 10), so too we adhere to the rule to promote policy concerns favoring private charitable assistance. Indeed, until recent times, family assistance has been the primary means of coping with a tragedy in this country. Were we to permit a tortfeasor to mitigate damages because of a third party's charitable gift, the plaintiff would be in a worse position than had nothing been done. Why would a family member (or a stranger) freely give of his or her money or time if the wrongdoer would ultimately reap the benefits of such generosity?

The concept of charity is embedded in basic notions of civic virtue, finding expression in legislation ranging from tax law to wills and estates and many others. When called upon to construe private humanitarianism,

---

[2]See also Annotation (1967) 7 A.L.R.3d 516, 519, section 2: "Where the plaintiff during the period of his disability receives salary or other compensation from his employer, the rule . . . in most jurisdictions is that the person whose negligence caused the injury to plaintiff is not entitled to mitigate or reduce damages in whole or in part by the amount of salary or wages received by plaintiff from his employer during the period of disability, whether the payments were pure gratuities or paid pursuant to a contractual obligation . . . . The reason advanced in support of the majority rule is that if anyone should profit by the payments it should be the injured employee rather than the tortfeasor."

One commentator, however, rates the issue a toss-up: "The application of the collateral source rule to benefits provided to the plaintiff as a gratuity is not totally clear. . . . [¶] While the treatment of unconditional gratuities may be unclear, the collateral source rule clearly applies in cases when the plaintiff would be obligated to repay what would otherwise be a gratuity if the plaintiff becomes able to do so." (4 Levy et al., Cal. Torts (1999) § 53.20[8], pp. 53-23 to 53-24.)

" 'courts do not now adopt an antagonistic spirit toward [a donor's] charitable intent for it is the rule that where doubt exists, a gift must be interpreted in favor of a charity.' " (*Estate of Heil* (1989) 210 Cal.App.3d 1503, 1510 [259 Cal.Rptr. 28]; see also *Estate of Tarrant* (1951) 38 Cal.2d 42, 46 [237 P.2d 505, 28 A.L.R.2d 419] ["It is the policy of the law to favor gifts for charitable purposes . . . ."].)[3]

This is more than "do-gooderism"; the state's own self-interest is involved as well. To the extent that private generosity steps to the fore, the impact on the state is lightened "by rendering beneficences which the state would otherwise be obliged to furnish or indirectly further the interests of the state by the public benefit they promote." (*Estate of Fleming* (1948) 31 Cal.2d 514, 519 [190 P.2d 611].)

Charitable contributions are primarily motivated by the intended use to which donations are put. Under these circumstances, we logically turn to the intent of the donors. Whom did they intend to help when they gratuitously agreed to cover lost wages? The person who caused the accident? Or the victim? We doubt such gifts would continue if, notwithstanding a donor's desire to aid the injured, the person who caused the injury ultimately stood to gain a windfall. Donors should not have to consult with a lawyer to make sure their largesse is not hijacked by the tortfeasor.

We do not necessarily consider a tort recovery made after gratuitous benefits are received as a windfall to the plaintiff, although it clearly might be a windfall to the defendant. As one leading treatise puts it, "Compensation in these cases is not double in any true sense. It might be condemned under a system that would give to each only according to his need, but even the Marxists have put aside this part of their philosophy for their nirvana." (4 Harper et al., Law of Torts, *supra,* § 25.22 at p. 661.) If a generous person chooses to pay the wages of someone who has been injured, intending to add the gift to the latter's compensation, "there seems to be no good reason for denying effect to such intention or for diverting it to another beneficiary, whether that other is a wrongdoer or not. . . . In these cases of private

---

[3]In *City of Palm Springs* v. *Living Desert Reserve* (1999) 70 Cal.App.4th 613 [82 Cal.Rptr.2d 859], the court refused to allow a city to use the power of eminent domain to renege on its promise to use a gift of 30 acres of donated land as a desert wildlife preserve without compensating the holder of the reversionary interest. (The city wanted to build another golf course instead.) The court acted in part because "if a public entity which had accepted a gift of property subject to a condition limiting the use of that property were permitted to avoid the force of the donor's restriction, donors would be discouraged from making such gifts in the future." (*Id.* at p. 628.) As in *City of Palm Springs*, we too are concerned that application of collateral source rule to charitable gifts to tort victims may discourage donors from making such gifts.

generosity the best solution seems to be a rule of thumb that would give greatest scope to the donor's generosity and to the adjustment of moral obligations within the more or less intimate relationships that usually bring such generosity into play. The gift should be disregarded in assessing damages." (*Id.* at pp. 661-663.)

Even without an ironclad requirement of reimbursement, the plaintiff may be motivated to repay the donor from any tort recovery, or, inspired by example, to similar acts of generosity on the notion that one good act leads to another. Such reimbursement would avoid any prospects of a double recovery, as if there ever could be a double recovery where pain and suffering is concerned. Moreover, as *Helfend* noted, the injured victim may not have been made whole because generally "plaintiff's attorney will receive a large portion of the plaintiff's recovery in contingent fees . . . . The collateral source rule partially serves to compensate for the attorney's share and does not actually render 'double recovery' for the plaintiff." (*Helfend* v. *Southern Cal. Rapid Transit Dist., supra,* 2 Cal.3d at p. 12.)

The rationale of the collateral source rule thus favors sheltering gratuitous gifts of money or services intended to benefit tort victims, just as it favors insurance payments from coverage they had arranged. No reason exists in these circumstances to confer a bonanza upon the party causing the injury. As one court noted nearly a century ago in connection with an employer's voluntary wage payment, "[I]f time has been lost as the result of a tort, sound sense, common justice, and, it may be, public policy would demand that the tortfeasor be prohibited from making a defense founded upon the proposition . . . that some third person, not only not in sympathy with the wrongdoer, but despising him and his act, has, from some worthy motive, paid to the injured person an amount which, if it had come from the wrongdoer, would have equaled the damages which would have been assessed against him." (*Nashville, C. & St. L.Ry.* v. *Miller* (1904) 120 Ga. 453. [47 S.E. 959, 960].)

III

A

While a gift is presumptively intended for the benefit of the donee, the presumption should be a rebuttable one. We can posit examples where a wrongdoer's family or friends might pay the victim's bills out of a sense of moral obligation or atonement. Public policy encourages such expiation. Under these circumstances the tortfeasor may well be entitled to an offset to effectuate the donors' intent and to avoid a double recovery. Put another

way, such sources might not be considered as "wholly independent" of the tortfeasor. (See, e.g., *Kardly* v. *State Farm Mut. Auto. Ins. Co.* (1989) 207 Cal.App.3d 479, 485 [255 Cal.Rptr. 40].)

We also do not decide whether the collateral source rule extends to payments from a public source.[4] The question of gratuitous *public* benefits is not at issue here and invokes a host of other concerns, which must be considered in light of their specific factual contexts. (*Helfend* v. *Southern Cal. Rapid Transit Dist.*, *supra*, 2 Cal.3d at p. 9.)

### B

■ The collateral source rule operates both as a substantive rule of damages and as a rule of evidence. As a rule of evidence, it precludes the introduction of evidence of the plaintiff being compensated by a collateral source unless there is a "persuasive showing" that such evidence is of "substantial probative value" for purposes other than reducing damages. (*Hrnjak* v. *Graymar, Inc.* (1971) 4 Cal.3d 725, 733 [94 Cal.Rptr. 623, 484 P.2d 599, 47 A.L.R.3d 224]; see also *Blake* v. *E. Thompson Petroleum Repair Co.* (1985) 170 Cal.App.3d 823, 830-832 [216 Cal.Rptr. 568].)[5]

We do not resolve such issues of admissibility here, but leave them to the sound discretion of the trial judge on remand. (*Hrnjak* v. *Graymar, Inc.*, *supra*, 4 Cal.3d at pp. 732-734.) We note, however, our decision does not automatically bar evidence that Arambula's wages were paid by his brother during his period of disability. For example, such evidence may be admissible, in the court's reasonable discretion and subject to a limiting instruction, to impeach his claimed inability to work. Evidence of actual wage payments may be persuasive to show that no time was lost, the employee actually performed substantial services during the period of disability, or had a motive to malinger. (See *Corsetti* v. *Stone Co.* (1985) 396 Mass. 1 [483

---

[4]See e.g., *Washington by Washington* v. *Barnes Hospital* (Mo. 1995) 897 S.W.2d 611 [41 A.L.R.5th 889] (collateral source rule does not apply to free governmental benefits previously received by plaintiff); 4 Harper et al., Law of Torts, *supra*, § 25.22 at pp. 663-664 ("[u]nless such [a contrary legislative] intent is made fairly clear, however, it seems reasonable to suppose that statutory benefits and free services furnished by government to needy classes of people are meant simply to make sure certain of their needs will be fulfilled and not to confer an additional bounty on the recipient"); but see *Ensor* v. *Wilson* (Ala. 1987) 519 So.2d 1244 (collateral source rule applies to *future* special education benefits by governmental entity because of uncertainty of their continued existence).

[5]The Legislature, as part of the Medical Injury Compensation Reform Act of 1975 (MICRA), has abrogated the collateral source rule as a rule of evidence in medical malpractice cases. MICRA allows defendants to introduce evidence the plaintiffs had received collateral source benefits, and it prohibits "collateral sources" from obtaining reimbursement from malpractice defendants. (Civ. Code, § 3333.1.)

N.E.2d 793, 802] [evidence of collateral source income relevant to show employee had motive other than physical disability not to work].)

In *Pensak* v. *Peerless Oil Co.* (1933) 311 Pa. 207, 210 [166 A. 792], an employee received salary payments (as a supposed gift) from his father and brother (who were co-owners of the business) during the time of his incapacity. But the court distinguished between making a claim of gift and proving it: "Characterizing as a gift the money paid to him does not make it so. To permit a recovery of money under the guise of wages lost would, with the facts as they here appear, open a wide door to misrepresentation and fraud in this class of cases."

IV-VI*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The defense verdict on Diane Arambula's loss of consortium claim in No. G023337 is affirmed. As to Michael Arambula, the cause in No. G023337 is remanded to the trial court for a limited new trial to determine the amount of damages for lost wages (if any) legally caused by defendant's negligence. The judgment for damages in his favor is otherwise affirmed.

The appeal in No. G023921 is dismissed. In the interest of justice, the parties are to bear their own costs in these appeals.

Sills, P. J., and Rylaarsdam, J., concurred.

The petition of all appellants for review by the Supreme Court was denied September 1, 1999.

---

*See footnote, *ante*, page 1006.